# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

**KAREN SYRACUSE,**                  Case No. 1:19 CV 1687

    Plaintiff,                               Judge Sara Lioi

    v.                                        Magistrate Judge James R. Knepp II

**COMMISSIONER OF SOCIAL SECURITY,**

    Defendant.                        **REPORT AND RECOMMENDATION**

## INTRODUCTION

Plaintiff Karen Syracuse ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter has been referred to the undersigned for preparation of a report and recommendation pursuant to Local Rule 72.2. (Non-document entry dated July 24, 2019). Following review, and for the reasons stated below, the undersigned recommends the decision of the Commissioner be affirmed.

## PROCEDURAL BACKGROUND

Plaintiff filed for SSI in February 2016, alleging a disability onset date of September 1, 2015. (Tr. 172-74). Her claims were denied initially and upon reconsideration. (Tr. 121-23, 129-30). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before an administrative law judge ("ALJ") on January 26, 2018. (Tr. 38-89). On May 10, 2018, the ALJ found Plaintiff not disabled in a written decision. (Tr. 22-32). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner.

(Tr. 1-6); *see* 20 C.F.R. §§ 416.1455, 416.1481. Plaintiff timely filed the instant action on July 23, 2019. (Doc. 1).

## FACTUAL BACKGROUND[1]

Personal Background & Testimony

Born in 1971, Plaintiff was 43 years old on her application date. *See* Tr. 30, 172. Plaintiff lived with two of her three children, ages eleven and fourteen. (Tr. 48). Plaintiff drove approximately every other day to the store, to pick her child up from school, or to a doctor's appointment. (Tr. 51).

Plaintiff had never worked full-time due to anxiety and caring for her children. (Tr. 52). She last worked in a front desk position at a doctor's office for eleven hours per week for two years. *Id.* Plaintiff resigned from that job due to anxiety. (Tr. 53). Plaintiff testified she was unable to work due to fibromyalgia, rheumatoid arthritis, Sjogren's syndrome and Hashimoto's disease, along with anxiety. (Tr. 53-54).

Plaintiff described daily pain in her wrists, hands, knees, feet, neck, and back; she also had headaches. (Tr. 54-55). She was "sore every day", "in pain", and "hurting constantly" in her hands and feet. (Tr. 54). Her pain was constant throughout the day, averaging six to seven on a scale of one to ten. (Tr. 55). She took medication, but tried not to take certain ones often because they upset her stomach. (Tr. 56).

Plaintiff estimated she could sit comfortably for approximately one hour, and stand for a half-hour before having to move around. (Tr. 56-57). She had pain in her feet walking just within her house, and estimated she could walk a half-block. (Tr. 57). Plaintiff stated that lifting a gallon

---

1. Although Plaintiff has both physical and mental limitations, only her physical limitations are at issue in this administrative appeal (*see* Doc. 12, at 2), and the undersigned therefore summarizes only the relevant records.

of milk hurt her hand. *Id.* She believed her foot pain, hand pain, and anxiety, had worsened over the prior several years. (Tr. 57-58).

Plaintiff testified that she did not feel that her medications were helping. (Tr. 59) ("[N]othing so far has seemed to help my pain and fatigue.").

Plaintiff performed daily chores like cleaning, meal preparation, laundry, and grocery shopping. (Tr. 60-61). She performed 70-75 percent of the household chores (with her children doing the rest), but it took her longer than previously. (Tr. 61). Her children helped with certain tasks like opening cans and jars, and lifting "things that are heavy". (Tr. 73). For exercise, Plaintiff testified that she tried to walk, but "it hurt[]". (Tr. 66).

Plaintiff testified that holding a pencil to write caused wrist pain. (Tr. 76-77). She could type on a keyboard, but had pain, stiffness, and achiness after a few minutes. (Tr. 77). She further had trouble reaching and grabbing things above her shoulder and below her waist depending on how heavy the item was. (Tr. 80). Plaintiff used heat to treat pain. (Tr. 78-79).

Plaintiff testified her treating physician was Dr. Rosian at the Cleveland Clinic and had last seen her one month prior. (Tr. 63). She explained that there was a gap in her treatment with Dr. Rosian where she saw other physicians, but then she returned. *Id.*

Relevant Medical Evidence

*Prior to Alleged Onset Date*

In March 2013, Plaintiff saw Rochelle Rosian, M.D., at the Cleveland Clinic for her ongoing rheumatoid arthritis. (Tr. 259). Plaintiff described feeling cold all the time, and an increase in symptoms in her hands, shoulders, knees, and feet. *Id.* Dr. Rosian noted some swelling and painful movement, and assessed rheumatoid arthritis. (Tr. 261). She prescribed Enbrel. *Id.*

In March and April 2014, Plaintiff saw Lyla Blake-Gumbs, M.D., who assessed, *inter alia*, rheumatoid arthritis, vitamin D deficiency, and fatigue. *See* Tr. 466, 483.

Plaintiff returned to Dr. Rosian in January 2015.[2] (Tr. 353-55). Plaintiff reported she had stopped Enbrel because it did not improve her symptoms. (Tr. 354). She described swelling in her hands and feet, and tenderness in her shoulders. *Id.* On examination, Plaintiff had minimal swelling and full range of motion in her wrists, left knee effusion and synovitis, and finger swelling and synovitis. *Id.* Dr. Rosian assessed vitamin D deficiency, thyroid disease, and arthritis; she prescribed Tramadol and referred Plaintiff for an orthopedic consult. (Tr. 355). Two months later, Plaintiff called Dr. Rosian requesting a different pain medication as Ultram and Icy Hot were not helping her wrist and left shoulder pain; Dr. Rosian prescribed prednisone. (Tr. 353).

In April 2015, Plaintiff saw John Shaffer, M.D., for right hand arthritis. (Tr. 293-96). Dr. Shaffer observed ulnar drift of the index, long, ring, and small finger of the right hand. (Tr. 295). He noted her rheumatoid deformity "is problematic for her activities of daily living" and recommended surgery. *Id.* April 2015 right hand x-rays showed osteoarthritis of the radiocarpal, intercarpal, first carpometacarpal, and the first through fifth metacarpophalangeal joints as well as "near total loss of the joint space between the lunate and triquetrum and capilate and hamate." (Tr. 678). Dr. Shaffer performed the surgery the following month. *See* Tr. 273, 290. Post-operative x-rays showed soft tissue swelling at the PIP joint of the left middle finger and the left first MCP joint, as well as intercarpal and radiocarpal joint space narrowing with narrowing of the second through fifth carpometacarpal joints. (Tr. 845). At a follow-up appointment, Dr. Shaffer noted Plaintiff was "doing well". (Tr. 290). Plaintiff was still "doing well" in June (Tr. 280) and Dr. Shaffer referred her for occupational therapy (Tr. 281).

---

2. Dr. Rosian noted Plaintiff's last visit was in December 2013. (Tr. 354).

4

*After Alleged Onset Date*

In a September 2015 visit with Dr. Shaffer, Plaintiff reported reduced range of motion across the metacarpophalangeal joints of all digits and morning stiffness in her right hand. (Tr. 277). On examination, Plaintiff had a "nicely healed" wound, her fingers were "aligned acceptably" and she had "an arc of motion of only about 50 [degrees] at MP joint for all digits." (Tr. 278). Dr. Shaffer directed Plaintiff to continue her therapy and return in two months. (Tr. 279).

In October, Plaintiff saw Rallis Ranjan, M.D. (Tr. 324-27). Dr. Ranjan noted Plaintiff had tried multiple medications (including Plaquenil, Methotrexate, Enbrel, and Humira), but had "been off all her medications for a couple years." (Tr. 325). She reported morning stiffness, soreness, and swelling; specifically, she described swelling in her wrist and fingers, stiffness in her neck, and aching in her back and knees. *Id.* On examination, Dr. Ranjan observed intact range of motion, no tenderness, no swelling, and no effusion in Plaintiff's shoulders and elbows. (Tr. 326). He noted some swelling in Plaintiff's fingers and wrists. *Id.* Dr. Ranjan ordered lab work, and prescribed Plaquenil and prednisone. (Tr. 327).

Plaintiff saw Elizabeth Brooks, M.D., at University Hospitals for a new patient visit regarding her rheumatoid arthritis in February 2016. (Tr. 675-81). Plaintiff reported morning stiffness, warmth in her wrist, and swelling in the left long finger PIP joint. (Tr. 675). On examination, Dr. Brooks noted swelling in Plaintiff's left long finger PIP joint, left elbow, and wrists. (Tr. 677). She had full range of motion in all joints, 5/5 motor strength "throughout" and intact sensation. *Id.* Dr. Brooks noted Plaintiff "clearly has active disease and would benefit from resuming a biologic" (Tr. 681); she ordered lab work and prescribed Meloxicam (Tr. 680). Plaintiff returned to Dr. Brooks in early March. (Tr. 531). Plaintiff continued to describe pain, stiffness, and swelling in her fingers and wrists, as well as warmth in other joints. *Id.* Dr. Brooks noted

5

swelling in multiple PIP joints, greatest in left long finger, bilateral wrist swelling with warmth and limited range of motion, and bilateral MCP thickening. (Tr. 533). Plaintiff "reported that she felt Enbrel worked better than Humira" and "was last on Enbrel 2 years ago"; Dr. Brooks recommended Simponi and prescribed wrist splints for night use. (Tr. 537). Later that month, Plaintiff saw a nurse for Simponi injection pen training. (Tr. 528-30). Her next dose was scheduled for 28 days later. (Tr. 529).

Plaintiff returned to Dr. Brooks in May 2016. (Tr. 523-27). She reported she had two doses of Simponi but did not think it was helping. (Tr. 523). Dr. Brooks noted that Plaintiff had "continued active disease on Simponi" and that "[s]he discontinued her methotrexate when she started Simponi and that is likely contributing to her continued symptoms." (Tr. 527). Prednisone helped and "she [was] 40% better since starting it." (Tr. 523). Plaintiff reported pain in her hands, wrists, feet, and neck, as well as TMJ pain and headaches. *Id.* She felt stiff "for half of every day". *Id.* On examination, Dr. Brooks noted swelling in the left long finger PIP joint and left thumb MCP joint, bilateral wrist swelling with loss of flexion and extension, a bunion at the right first MTP joint, and bilateral MTP squeeze tenderness. (Tr. 526). Dr. Brooks observed full range of motion in all other joints without erythema, warmth, or swelling, intact sensation, and 5/5 motor strength "throughout". *Id.* She restarted Plaintiff on Methotrexate and prescribed prednisone. *Id.* She instructed Plaintiff to follow up in eight weeks. (Tr. 527).

*Opinion Evidence*

In March 2016, State agency physician Mehr Siddiqui, M.D., reviewed Plaintiff's records. (Tr. 99-103). Dr. Siddiqui opined Plaintiff could occasionally lift or carry twenty pounds, and frequently carry ten. (Tr. 99). He opined Plaintiff could stand/walk or sit for six hours each in an eight-hour workday (Tr. 99); she could occasionally climb ladders, ropes, and scaffolds or crawl,

6

and frequently kneel or crouch (Tr. 100). He opined Plaintiff should avoid all exposure to hazards such as unprotected heights, operating heavy machinery, and commercial driving due to her rheumatoid arthritis. (Tr. 101).

In July 2016, State agency physician Dimitri Teague, M.D., reviewed Plaintiff's records and offered a similar opinion to that from Dr. Siddiqui. (Tr. 114-16). He added manipulative limitations, opining Plaintiff could handle and finger frequently bilaterally "due to some [bilateral] hand deformities." (Tr. 116). He noted Plaintiff had 5/5 hand strength "but [she] does have some tenderness." *Id.*

Also in July 2016, Dr. Rosian completed an "Arthritis Medical Source Statement". (Tr. 670-73). Regarding her "[f]requency and length of contact" with Plaintiff, she wrote "yearly." (Tr. 670). In response to a question about Plaintiff's pain, Dr. Rosian noted she had not seen Plaintiff since January 2015 and was completing the form based on information from her file. *Id.* She noted Plaintiff had rheumatoid arthritis since age sixteen and her prognosis was fair; her symptoms were joint pain, fatigue, depression, brain fog, limited joint range of motion, and neck pain. *Id.* Dr. Rosian believed Plaintiff could sit for one hour at a time, and stand for 45 minutes at one time. (Tr. 671). She did not answer a question asking how many city blocks Plaintiff could walk, or how long Plaintiff could sit, or stand/walk in an eight-hour workday. *Id.* Dr. Rosian further opined Plaintiff needed a job that permitted shifting positions at will, and the ability to walk around every ninety minutes for ten minutes. (Tr. 671-72). She further opined Plaintiff would require four unscheduled ten-minute breaks to sit quietly or walk during a workday. (Tr. 672). She believed Plaintiff could rarely[3] lift less than ten pounds, and never lift more; she could rarely twist,

---

3. The form defined "rarely" as "1% to 5% of an 8-hour working day." (Tr. 672).

7

stoop/bend, or crouch squat, and never climb ladders or stairs[4]. *Id.* Dr. Rosian opined Plaintiff could use her hands to grasp, twist, or turn 25 percent of the day, use her fingers for fine manipulation 25 percent of the day, and use her arms for frontal reaching 25 percent of the day; she would be unable to use her arms for overhead reaching. (Tr. 673). She further opined Plaintiff would be off-task ten percent of a workday, could tolerate moderate stress, and would be absent from work about two days per month. *Id.* Finally, Dr. Rosian wrote that Plaintiff "has had [rheumatoid arthritis] for many years and usually does fairly well." *Id.* She further wrote something else illegible about difficulty with medication. *See id.*

VE Testimony

A VE testified at the hearing before the ALJ. (Tr. 81-87). The ALJ asked the VE to consider a hypothetical individual with Plaintiff's age, education, work experience, and residual functional capacity ("RFC") as ultimately determined by the ALJ. *See* Tr. 83-86. The VE responded that such an individual could perform jobs such as document preparer, addresser, and press clipping cutter and paster. (Tr. 85-86).

ALJ Decision

In his May 10, 2018 decision, the ALJ found Plaintiff had not engaged in substantial gainful activity since her application date of September 23, 2015. (Tr. 24). He found Plaintiff had severe impairments of: rheumatoid arthritis, degenerative changes of the bilateral hands, post metacarpophalangeal arthroplasties of the index, long, ring, and small finger; Sjogren's syndrome, Hashimoto's disease/hypothyroidism; hallux valgus and bunion formation on the right with cystic change identified in the right first metatarsal head medially, mild scoliosis, depression, and

---

4. Dr. Rosian checked boxes indicating both "never" and "occasionally" regarding Plaintiff's stair climbing ability. (Tr. 672).

anxiety. *Id.* He found, however, that none of these impairments – singly or in combination – met or medically equaled the severity of a listed impairment. *Id.* The ALJ then determined Plaintiff retained the RFC:

> to perform sedentary work as defined in 20 CFR 416.967(a) except [she] can frequently operate left and right hand controls. [She] can frequently handle and finger with the left and the right. [She] can occasionally balance, stoop, kneel, crouch, and crawl. [She] should never be exposed to unprotected heights, moving mechanical parts, or operate a motor vehicle. [She] is limited to performing simple, routine, and repetitive tasks, but not at a production rate pace (*i.e.* assembly line work). [She] is limited to simple work-related decisions in using her judgment and dealing with changes in the work setting. [She] is able to frequently interact with supervisors, coworkers, and the public.

(Tr. 26-27). The ALJ then concluded that given Plaintiff's age, education, work experience, and RFC, there were jobs existing in significant numbers in the national economy that she could perform, including document preparer, addresser, and press clipping cutter and paster. (Tr. 31). Therefore, he found Plaintiff not disabled. *Id.*

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn

"so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 416.920—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and

meets the duration requirements, is she determined to be disabled. 20 C.F.R. § 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff contends the ALJ's reasons for discounting Dr. Rosian's opinion are not supported by the record and do not constitute the regulatory-required "good reasons" for discounting a treating physician's opinion. For the reasons discussed below, the undersigned recommends the Commissioner's decision be affirmed.

Generally, the medical opinions of treating physicians are afforded greater deference than those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188.[5] A treating physician's opinion is given "controlling weight" if it is supported by (1) medically acceptable clinical and laboratory diagnostic techniques; and (2) is not inconsistent with other substantial evidence in the case record. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). The requirement to give controlling weight to a treating source is presumptive; if the ALJ decides not to do so, he must provide evidentiary support for such a finding. *Id.* at 546; *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376-77 (6th Cir. 2013). When the physician's medical opinion is not granted controlling weight, the ALJ must give "good reasons" for the weight given to the opinion. *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)).

"Good reasons" are reasons "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons

---

5. Although recent revisions to the CFR have changed the rules regarding evaluation of treating physician opinions, such changes apply to claims filed after March 27, 2017, and do not apply to claims filed prior to that date. *See* Social Sec. Admin., *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5852-53, 2017 WL 168819. Plaintiff filed her claim in 2016 and thus the previous regulations apply.

11

for that weight." *Id.* (quoting SSR 96-2p, 1996 WL 374188, at *4). When determining weight and articulating good reasons, the ALJ "must apply certain factors" to the opinion. *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.* While an ALJ is required to delineate good reasons, he is not required to enter into an "exhaustive factor-by-factor analysis" to satisfy the requirement. *See Francis v. Comm'r of Soc. Sec. Admin.*, 414 F. App'x 802, 804-05 (6th Cir. 2011).

>The ALJ explained his consideration of Dr. Rosian's opinion:
>
>As for the opinion evidence, the undersigned has considered the medical source statement completed by Rochelle Rosian, MD, the claimant's rheumatologist from 2013 through 2015. On this checklist form medical source statement completed on July 23, 2016, the physician noted that she could not provide specific answers regarding the nature, location, frequency, precipitating factors, and severity of the claimant's arthritis pain, because she had not seen the claimant since January 2015. (Exhibit 16F, p. 2). Still, the physician went on to assess a significantly limited range of less than sedentary work activity, lifting less than 10 pounds "rarely," and with the claimant requiring the ability to shift positions at will and take at least four unscheduled breaks per workday. Dr. Rosian also assessed an ability to perform grasping, turning, fine manipulations, and reaching in front only 25 percent of the workday, and no ability to reach overhead. (Exhibit 16F, p. 4).
>
>The undersigned can accord minimal weight to this opinion, as the extreme limitations are at odds with the evidence contained in the claimant's progress notes, as well as her own reports regarding her daily functioning and demonstrated abilities. Additionally, this physician acknowledged the limited scope of this opinion, noting she saw the claimant only yearly, and had not seen her since January 2015, despite completing this report in July 2016. Subsequent to Dr. Rosian's last examination of the claimant, she underwent metacarpophalangeal arthroplasties on several joints of the right hand in May 2015, which resulted in no surgical complications. In progress notes following the surgery, physical examinations revealed some intermittent swelling and tenderness in the bilateral hands, but there was full range of motion, intact sensation, and normal motor function. The claimant's treatment was conservative and routine in nature, and no further surgical intervention was recommended for any of her affected joints. Therefore, the opinion

      of Dr. Rosian cannot be seen as representative of the claimant's functioning throughout the relevant period.

(Tr. 29).

Plaintiff first argues the ALJ's statement that Dr. Rosian had not seen Plaintiff since January 2015 "is inaccurate as the record shows that Dr. Rosian examined Plaintiff in February 2016." (Doc. 12, at 14) (citing Tr. 675-81). But it is Plaintiff's statement that is inaccurate. The cited February 2016 record is from a visit with Dr. Brooks, who worked at a different facility (University Hospitals) than Dr. Rosian (Cleveland Clinic). *See* Tr. 675-81.

The ALJ's statement that Dr. Rosian's opinion was outdated speaks to the supportability of the opinion. *See* 20 C.F.R. § 416.929(c)(3) ("The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion. The better an explanation a source provides for a medical opinion, the more weight we will give that medical opinion."). The ALJ specifically stated that although acknowledging that she had not seen Plaintiff in eighteen months, Dr. Rosian "[s]till . . . went on to assess a significantly limited range of less than sedentary work activity[.]" (Tr. 29). Further, one of the regulatory factors to be considered in evaluating a treating physician's opinion is the treatment relationship. 20 C.F.R. § 416.929(c)(2)(ii) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion."). Thus, the ALJ properly considered, as one factor, that during their treatment relationship, Dr. Rosian saw Plaintiff "only yearly" and that she had not recently seen Plaintiff at the time she issued her opinion. (Tr. 29).

Next, the ALJ addressed the consistency of Dr. Rosian's opinion with the record as a whole. *See* Tr. 29 ("the extreme limitations are at odds with the evidence contained in the claimant's progress notes, as well as her own reports regarding her daily functioning and demonstrated

13

abilities"). Plaintiff objects to this statement, arguing "[t]he ALJ is not specific here and does not cite examples." (Doc. 12, at 14). This is true, however, "[a]lthough the ALJ did not specifically identify the previously discussed . . . evidence, it is clear which evidence he was referring to and thus strict compliance with the regulations is not necessary in this instance". *Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 468, 474 (6th Cir. 2016). On the prior page, the ALJ discussed in detail Plaintiff's reported daily activities, describing how he found them inconsistent with an allegation of disability:

> [T]he claimant's own statements regarding her daily activity are inconsistent with completely disabling symptoms arising from this impairment. The claimant reported that she can use her upper extremities to attend to regular self-care, she can use a phone and a[] computer, she can drive a car, and she can perform the bulk of her family's household chores, suggesting that she retains the ability to move her upper extremities to perform frequent fine manipulation functions, despite the deformities caused by rheumatoid arthritis.
>
> Additionally, the record failed to demonstrate constitutional symptoms that would preclude sedentary activity. The claimant reported ongoing fatigue, but she appeared comfortable and alert during treatment visits, suggesting that she was capable of engaging in seated activities. * * *
>
> While the objective evidence was consistent with physical impairments that would reasonably cause pain and fatigue, the severity and frequency of the symptoms described by the claimant were unsupported. Although she described moderate to high levels of pain, she routinely presented to treating sources with no signs of acute distress.

(Tr. 28). These statements are supported by substantial evidence. *See* Tr. 51 (Plaintiff's testimony that she drove every other day); Tr. 60-61 (Plaintiff's testimony that she performed daily chores such as cleaning, meal preparation, laundry, and grocery shopping); Tr. 61 (Plaintiff's testimony that she performed 70-75 percent of the household chores). Although Plaintiff contends that her activities were more limited, emphasizing that she testified that chores take her longer and she had help from her children (Doc. 12, at 15 (citing Tr. 57-58)), the ALJ's interpretation of these activities as inconsistent with Dr. Rosian's opinion is also reasonable. *See Jones*, 336 F.3d at 477

14

(even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ").

Further, in the following paragraph, the ALJ cited Plaintiff's May 2015 hand surgery and progress notes thereafter. (Tr. 29). Plaintiff contends that this cannot be a reason to detract from Dr. Rosian's opinion "especially because Dr. Rosian was well aware of this surgery when rendering her opinion (over a year after this surgery)." (Doc. 12, at 15). But Plaintiff provides no citation for this statement, Dr. Rosian did not mention Plaintiff's surgery in her opinion, and the opinion on its face seems to directly contradict Plaintiff's statement in that Dr. Rosian said: "I have not seen her since Jan[uary] 2015. Will complete form from info from file." (Tr. 670). The ALJ described that Plaintiff had no surgical complications and that following the surgery "physical examinations revealed some intermittent swelling and tenderness in the bilateral hands, but there was full range of motion, intact sensation, and normal motor functioning." (Tr. 29). This is supported by the record. *See* Tr. 526 (Dr. Brooks's May 2016 observation of some finger and wrist swelling, but intact sensation, and 5/5 motor strength "throughout"); Tr. 677 (Dr. Brooks's February 2016 examination showing some swelling in wrists, finger, and elbow, but full range of motion, intact sensation, and 5/5 motor strength "throughout"); Tr. 326 (Dr. Ranjan's October 2015 examination showing some swelling in Plaintiff's wrists and hands, but no tenderness); *see also* Tr. 280, 290 (Dr. Shaffer's notes that Plaintiff was "doing well" in May and June 2016 after her hand surgery). The ALJ reasonably found that these records were inconsistent with Dr. Rosian's "extreme limitations" (Tr. 29), properly invoking the regulatory factor of consistency. 20 C.F.R. § 416.927(c)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion.").

Finally, the ALJ cited that Plaintiff's "treatment was conservative and routine in nature, and no further surgical intervention was recommended for any of her affected joints." (Tr. 29). Plaintiff argues this is inaccurate, stating that "[s]he has been on aggressive medications/injections for RA, including E[n]brel, Humira, Methotrexate, Prednisone among others." (Doc. 12, at 16). Plaintiff is correct that she had been on multiple medications, but the undersigned finds the ALJ reasonably classified this treatment as "conservative and routine". During the relevant time period, Plaintiff saw Dr. Shaffer once in September 2015 (to follow up on her surgery) (Tr. 278-79), Dr. Ranjan once in October 2015 (at which time Dr. Ranjan noted Plaintiff had been off medication, and prescribed Plaquenil and prednisone) (Tr. 325-27), and Dr. Brooks three times in February, March[6], and May 2016 (at which time Dr. Brooks prescribed medication and provided wrist splints) (Tr. 675-81, 531-37, 523-27). Moreover, as the ALJ pointed out, prior to her alleged onset date, according to Dr. Rosian, Plaintiff was only seen yearly. (Tr. 29) (citing Tr. 670). Conservative treatment is a good reason to discount a treating physician opinion, *see Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 631 (6th Cir. 2016), and the level of treatment sought is a legitimate reason on which the Commissioner may rely to discount alleged symptom severity, *see Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 727 (6th Cir. 2013); *see also* SSR 16-3p, 2017 WL 5180304, at *8 ("[I]f the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints . . . we may find the alleged intensity and persistence of an individual's symptoms inconsistent with the overall evidence of record.").

---

6. Plaintiff also had a visit with a nurse practitioner for Simponi injection training in March. *See* Tr. 528-30.

In her challenge to the ALJ's conclusions, Plaintiff points primarily to her self-reported symptoms of pain, stiffness, and swelling in the treatment record and her testimony. *See* Doc. 12, at 14-15. But the ALJ addressed these symptoms, and as described above, found them not entirely consistent with the record as a whole. These are valid reasons for discounting subjective symptoms. *See* 20 C.F.R. § 416.929(c)(2)-(3) (listing, as factors to consider in evaluating subjective symptoms, *inter alia*, objective medical evidence, daily activities, and medication/treatment received); *see also* SSR 16-3p, 2017 WL 5180304. Moreover, the ALJ acknowledged Plaintiff's positive examination findings; he did not ignore them. See Tr. 28, 29.

Plaintiff can certainly point to evidence supporting Dr. Rosian's opinion and indicating that she is more limited than the ALJ found, but this Court must affirm if substantial evidence also supports the decision reached by the ALJ. *Jones*, 336 F.3d at 477. The undersigned finds that the ALJ's reasons – which address the consistency and supportability of Dr. Rosian's opinion – are good reasons, that is, reasons "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p, 1996 WL 374188, at *4. As such, the undersigned recommends the decision be affirmed.

## CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying SSI supported by substantial evidence and recommends the decision be affirmed.

 s/ James R. Knepp II
United States Magistrate Judge

17

*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).